UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>ANDRE BRYANT,<br>Defendant. | Case No. 21-cr-00258-SI-1<br><br>**ORDER GRANTING DEFENDANT'S MOTION IN LIMINE TO EXCLUDE EXPERT TESTIMONY OF DEA SPECIAL AGENT CARLOS ALFARO**<br><br>Re: Dkt. No. 109 |

On September 25, 2026, the Court held a *Daubert* hearing regarding one of the government's proffered expert witnesses, DEA Special Agent Carlos Alfaro. For the reasons set forth below, the Court GRANTS defendant's motion to exclude Mr. Alfaro.

## BACKGROUND

On July 7, 2020, defendant Andre Bryant was arrested after police responded to a report by the manager of a hotel in American Canyon that people were "dealing drugs" in the hotel parking lot. Officers searched Bryant's person and the crossbody bag he was wearing incident to that arrest and discovered a .40 caliber semi-automatic pistol with a round in the chamber, approximately a pound[1] of heroin, 14 grams of cocaine, 12 grams of methamphetamine, other drugs, and indicia of drug dealing such as a scale.

On September 14, 2026, the government provided an expert disclosure for DEA Supervisory Special Agent Carlos Alfaro. On September 21 the government provided a supplemental disclosure. The September 14 disclosure states that the government intends to call Special Agent Alfaro "to

[1] On the day of Bryant's arrest, the American Canyon Police Department reported the gross weight of the heroin to be approximately 460 grams. The Drug Enforcement Administration ("DEA") weighed the heroin again on December 10, 2021, and found it to have a net weight of 458.7 grams and a gross weight of 559.2 grams

testify regarding the modus operandi of drug traffickers," and provides the following summary of Alfaro's opinions:

> **Methods used in the course of drug trafficking / distribution.** SSA Alfaro is expected to testify as to the methods and modus operandi of drug traffickers, including but not limited to common practices such as: meeting in public areas to conduct the exchange, meeting in vehicles, the expediency of the transactions, the tendency for dealers to have more than one type of controlled substance in their possession, the tendency for dealers to have in their possession paraphernalia such as scales, small baggies, the tendency of drug dealer to carry substantial amounts of cash, etc.
>
> **Firearm uses in the course of drug trafficking / distribution.** SSA Alfaro is expected to testify it is common that individuals engaging in drug trafficking / distribution to carry firearms in order to secure their product as well as proceeds. SSA Alfaro is expected to also testify that his opinion in this case is that the defendant possessed the firearm in furtherance of a drug trafficking crime due to its ease of access (in a cross body bag worn by the defendant that also contained the controlled substances), the fact that the firearm was loaded and with one bullet in the chamber (indicating the ability to use the firearm as quickly if necessary), and given the firearm was found along with a large amount of cashand controlled substances.
>
> **Market value of the controlled substances seized.** SSA Alfaro is expected to testify as to the street value of heroin, methamphetamine, and cocaine in the Bay Area in 2020 and opine as to his estimation of the total value of the drugs seized in this matter based on weight.

Dkt. No. 109, Ex. A. The September 21 disclosure, which was provided after Bryant filed a *Daubert* motion seeking to exclude Special Agent Alfaro, provided a more detailed description of the specific opinions that Special Agent Alfaro intended to offer under each of the three bolded categories listed above. Dkt. No. 111-1.[2] For example, the September 21 disclosure lists twelve specific opinions that Agent Alfaro would provide about modus operandi, including:

- Bryant had large amounts of cash in different denominations and contained in different pockets. This is common of drug dealers, who will also frequently have smaller denominations and different denominations when they are street-level dealers.

[2] For example, the September 21 disclosure states, "SSA Alfaro will testify that the following details, when viewing collectively, indicate that Bryant was trafficking drugs on July 7, 2020 . . . Bryant had large amounts of cash in different denominations and contained in different pockets on his person. This is common of drug dealers, who will also frequently have smaller denominations and different denominations when they are street-level dealers. . . . Bryant had multiple different types of substances, and the heroin and meth were located in multiple individual bags in addition to many other small empty baggies and balloons which are used to distribute. . . . Bryant had a firearm and the majority of the drugs in his bag. The heroin found in his pocket was already packaged and ready to be sold. If need be, such as if encountered by law enforcement, it is common for dealers to keep their drugs and firearm(s) separate from the cash as those are illicit items and can be 'ditched' quickly while the dealer still keeps the cash." *Id.* at 2-3.

- Bryant had a small amount of heroin in his pocket, along with cash at the time. This indicates he was ready to distribute small amounts of heroin to purchasers as it would be atypical for a dealer to prepare and divide up heroin to purchasers as it would be atypical for a dealer to prepare and divide up heroin with the customer present but would have done it in advance.

- The use of public spaces, specifically parking lots, of a hotel like the Fairfield Inn and Suites in American Canyon, is a common area for drug trafficking given that the volume of foot and vehicle traffic can minimize the attention drawn by the traffickers and also provide an innocuous reason for their presence in the area if stopped by law enforcement. . . .

- Bryant had multiple different types of substances, and the heroin and meth were located in multiple individual bags in addition to many other small empty baggies and balloons which are used to distribute.

Dkt. No. 111-1 at 2. Special Agent Alfaro is offered solely as an expert witness on drug trafficking practices, and he was not involved in any law enforcement investigation into Bryant nor was he involved in Bryant's arrest.

On September 25, 2026, the Court held a *Daubert* hearing. Counsel for the government and defendant questioned Special Agent Alfaro about his qualifications, experience, and the bases for his proffered opinions. Agent Alfaro testified that he has been employed by the DEA since 2005, and that he is currently the Group Supervisor in the San Francisco office for the Financial Investigation Group, which investigates transactions involving illicit substances on the dark web as well as money laundering, including the use of real property for money laundering. Agent Alfaro testified that between 2005-2017, he was involved in more than 100 marijuana trafficking investigations, and he has testified as government expert in three federal criminal cases involving marijuana trafficking. Between 2017 and 2023, Agent Alfaro was a legal instructor at the FBI Academy in Quantico, Virginia, and he instructed agent trainees on Fourth Amendment Search and Seizure, Fourth Amendment Use of Force, Conspiracy, Electronic Surveillance, Federal Rules of Evidence, and Federal Rules of Criminal Procedure. Since November 2023, in addition to his work supervising the Financial Investigation Group, Agent Alfaro has participated in multiple street-level drug enforcement operations in San Francisco, primarily in the Tenderloin neighborhood. Those operations have involved seizures of fentanyl, methamphetamine, cocaine, and heroin from street level drug dealers. Agent Alfaro testified that he did not have any experience with drug enforcement operations in American Canyon.

United States District Court
Northern District of California

**LEGAL STANDARD**

Federal Rule of Evidence 702 permits the introduction of expert testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "To qualify as an expert, a witness must have 'knowledge, skill, experience, training, or education' relevant to such evidence or fact in issue." *United States v. Chang*, 207 F.3d 1169, 1172 (9th Cir. 2000) (citing Fed. R. Evid. 702). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 (Advisory Committee Notes, 2000 Amendments). The Ninth Circuit has acknowledged that *Daubert* "may be harder to apply when the expert testimony is 'experience-based' rather than 'science-based.'" *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020). "But any such difficulty cannot simply lead to a 'that goes to weight, not admissibility' default." *Id*. Additionally, Rule 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

Rule 702 requires that the trial court act as a "gatekeeper" by "making a preliminary determination of whether the expert's testimony is reliable." *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002) (citations omitted); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). The trial court must make an "explicit" finding on the record that an expert's testimony is reliable if the court deems that testimony admissible. *See United States v. Holguin*, 51 F.4th 841, The decision whether to admit or exclude expert testimony lies within the trial court's discretion. *See General Elec. Co. v. Joiner*, 522 U.S. 136, 141-42 (1997); *United States v. Calderon–Segura*, 512 F.3d 1104, 1109 (9th Cir. 2008). "[E]xpert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the

proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 (Advisory Committee Notes, 2023 Amendments).

**DISCUSSION**

Bryant contends that the government has not met its burden to show that Agent Alfaro's proposed expert testimony is admissible. Bryant argues that much of Agent Alfaro's proposed testimony is beyond the scope of his relevant experience, lacks a reliable foundation, amounts to improper opinion about Bryant's ultimate intent, is overly prejudicial under Rule 403, and/or is improper lay opinion testimony regarding subject matter that is within the grasp of the jury to comprehend.[3] The government asserts that Agent Alfaro's "21.5 years of experience as a narcotics-focused federal law enforcement agent" "constitutes a reliable methodology for his proposed testimony on drug trafficking." Dkt. No. 111 at 5.

At the *Daubert* hearing, defense counsel questioned Alfaro Agent about the basis and methodology he used to reach his opinions. Agent Alfaro stated that his methodology is based on his experience with drug traffickers over the years, and that when formulating an opinion he considers factors such as the amount of drugs seized, lab reports, watching surveillance video, and the pattern of drug trafficking in the area. However, Agent Alfaro acknowledged that he had not viewed any surveillance footage in this case, had not examined drug trafficking in American Canyon, either in 2020 or at any time, and he had not worked in American Canyon, though he had worked in rural areas of Napa County.

The Court has carefully considered the government's proffer and Agent Alfaro's testimony at the *Daubert* hearing, and concludes that based upon the record and the facts of this case, the government has not met its burden to show that Agent Alfaro's proposed expert testimony is admissible. The Court recognizes that Agent Alfaro has testified as an expert in three federal criminal cases involving marijuana trafficking, but this case does not involve marijuana trafficking. *See, e.g.*, *United States v. Ung*, Case No. CR 11-0820 CRB, Dkt. No. 101 (Notification of

[3] Bryant also contends that the expert disclosures for Special Agent Alfaro were late and inadequate. The Court finds that these challenges lack merit and that the government's disclosures were timely and that the disclosures were sufficiently detailed.

Anticipated Expert Testimony of Carlos Alfaro) (N.D. Cal. Oct. 25, 2013); *United States v. Li*, Case No. CR 08-0461 PJH, Dkt. No. 617 (Notification of Anticipated Expert Testimony of Carlos Alfaro) (N.D. Cal. Feb. 23, 2011). In *Ung*, the government's expert disclosure described Agent Alfaro's extensive experience involving marijuana cultivation and trafficking, including *inter alia* courses that he took and taught regarding marijuana investigations, as well as his experience inspecting, searching and viewing hundreds of indoor and outdoor marijuana cultivation sites in urban and rural areas; the investigation of the means by which marijuana traffickers are paid and the means by which they concealed the proceeds of their sales; the seizure or eradication of over 100,000 growing marijuana plants; experience speaking with people who have cultivated, imported and trafficked in marijuana; and participation in intercepting phone calls by traffickers and the interpretation of coded language in those calls. *Ung*, Dkt. No. 101 at 2-3; *Li*, Dkt. No. 617 at 2-3.

In contrast, Agent Alfaro's experience with trafficking of heroin, methamphetamine and cocaine has been much more limited, only beginning in November 2023, and during that time he has also been the Supervisor of the Financial Investigations Group, expertise that is not implicated in this case. Agent Alfaro's experience with street-level trafficking has been focused on the Tenderloin neighborhood of San Francisco, an area that has a unique combination of factors that are not necessarily present in American Canyon, and the government has not articulated how Agent Alfaro's experience in the Tenderloin qualifies him to opine on drug trafficking in American Canyon in 2020, particularly in light of Agent Alfaro's testimony that he has not studied or examined drug trafficking patterns in American Canyon.

"Law enforcement experts may testify as to the general practices of criminals to establish the defendants' modus operandi which helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior." *United States v. Anchrum*, 590 F.3d 795, 804 (9th Cir. 2009) (internal citation and quotation marks omitted); *see also United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) (expert testimony subject matter "must be beyond the common knowledge of the average layman"). The Court finds it significant that unlike *Ung* and *Li*, which involved multi-defendant drug trafficking conspiracies and where Agent Alfaro was offered to provide specialized testimony on

topics such as the use of coded language on intercepted phone calls, the types of equipment used for indoor marijuana cultivation, and the use of pay-owe ledgers and coded language used therein, the facts of this case are not complicated.[4] This case involves a single defendant charged with possession for sale after he was arrested in a hotel parking lot with a loaded firearm, approximately a pound of heroin, 14 grams of cocaine, and 12 grams of methamphetamine. Some of the topics listed in Agent Alfaro's disclosure, such as "It is common for drug dealers and/or purchasers to drive to certain locations and immediately leave thereafter" or "Drug dealers typically carry [a] firearm for protection," are the types of topics that are within the common knowledge of the average lay person, and "expert" testimony on these topics is both unnecessary and raises Rule 403 concerns.

Further, while a case need not be complex in order for law enforcement expert testimony to be admissible, "law enforcement expert testimony itself reinforces the legitimacy of the personnel offering it," and "because law enforcement experts use no systemic methodology, 'reliability becomes more, not less, important.'" *United States v. Holguin*, 51 F.4th 841, 868 (9th Cir. 2022) (Berzon, J. concurring) (quoting *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020)). Here, when Special Agent Alfaro was questioned about the "methodology" he used to arrive at various opinions, Agent Alfaro's answers revealed a fluidity that was concerning. For example, with regard to his opinion about Bryant having cash in different pockets, Agent Alfaro testified that the use of multiple pockets, or the use of a single pocket, could be indicative of drug dealing. Similarly, Agent Alfaro testified that having multiple types of substances was indicative of drug dealing, that "multiple" was anything more than one, and that also having a single drug on one's

[4] In *Ung* and *Li*, the defendants were charged with participating in marijuana trafficking conspiracies, and Agent Alfaro was offered as an expert regarding the modus operandi of marijuana cultivators and traffickers, as well as money laundering techniques. The *Ung* disclosure described Agent Alfaro's proposed testimony as "the set up and equipment involved in an indoor marijuana grow; how an indoor grow operates; how to calculate the yield from an indoor grow and the anticipated yield from the grow at 135 Costanza; the market price per pound for indoor-grown marijuana in 2011; the reasons to conceal the operation going on inside a grow house and the methods for concealing that operation, including the selection of the location to house it; the operation of a marijuana trafficking organization, including the roles of its different members; the approximate costs involved in setting up this grow; the reasons for bypassing the metered power system; the number of plants found in the house and the number of plants it was being prepared to accommodate." *Ung*, Dkt. No. 101 at 4. The *Li* disclosure stated that Agent Alfaro would testify about procedures used to cultivate and distribute marijuana; telephonic communication methods used by narcotic traffickers; methods of payment and money laundering techniques; and the use of pay-owe ledgers by narcotic traffickers. *Li*, Dkt. No. 617 at 4-7.

person could be indicative of drug dealing. The Court recognizes that expertise based on experience does not neatly lend itself to quantitative analysis and methodologies. However, even where a law enforcement officer has sufficient knowledge and experience to qualify as an expert, the government must still demonstrate that there is a reliable basis for the proffered opinions. *See Valencia-Lopez*, 971 F.3d at 900-01 (district court abused its discretion admitting testimony where "Agent Hall never explained the methodology, if any, that he relied on to arrive at the near-zero probability of drug trafficking organizations using coerced couriers. . . . [and] the record does not establish the method Agent Hall employed to arrive at his 'almost nil' opinion" and "general testimony about his interviews with cartel members in Mexico is too 'vague and generalized' to establish any reliable principles or methods, id., from which to determine the reliability of his almost nil conclusion."); *see also United States v. Vera*, 770 F.3d 1232, 1243, 1247 (9th Cir. 2014) (general law enforcement experience in the FBI and gang task force insufficient to support drug expert testimony about meaning of words in intercepted phone calls not based on reliable methodology).

The government's disclosure also states that Agent Alfaro will offer valuation testimony. The government's supplemental disclosure states that it is anticipated that Special Agent Alfaro will testify:

> • A typical dose or user amount of heroin is approximately 0.1 grams. The user will typically purchase multiple doses packaged into a single bag, balloon, or "bindles." A typical end user would purchase about 0.5 – 1.0 gram of heroin at one time.
>
> • Given that, 460 grams of heroin would be approximately 4,600 doses or individual user amounts.
>
> • A typical dose or user amount for the area in 2020 would have been approximately $35.00/gram. Thus, the amount of heroin seized from Bryant would have had the street value of approximately $16,000.00.
>
> • A typical dose or user amount of methamphetamine is approximately 0.05 grams and would have had a street value of $3.50 - $4.00/gram in 2020. A typical end user would purchase 0.5 – 1.0 grams of methamphetamine.
>
> • A typical end user would purchase a gram amount of cocaine, which would have had a street value of $35.00 - $40.00/gram in 2020 .

Dkt. No. 111-1 at 3-4.

The government has not provided any basis from which the Court can conclude that this proposed valuation testimony is admissible. As discussed above, prior to November 2023, Special Agent Alfaro's experience with narcotics trafficking was limited to marijuana. Since November

United States District Court
Northern District of California

2023, Agent Alfaro "has participated in multiple street level drug enforcement operations in San Francisco" and those operations resulted in seizures of "multiple kilograms of fentanyl, methamphetamine, cocaine, and heroin from street level drug dealers." *Id*. at 1. Without more, the Court cannot conclude that Agent Alfaro is qualified to opine about the valuation of heroin, cocaine and methamphetamine in 2020 in American Canyon. Agent Alfaro testified that he has not worked in American Canyon, and thus it is not clear to the Court how he could opine about a "typical dose or user amount for the area in 2020."

At the hearing, the government directed the Court to *United States v. Mendoza-Paz*, 286 F.3d 1104 (9th Cir. 2002). However, the facts of *Mendoza-Paz* underscore what is missing in this case. In *Mendoza-Paz*, the Ninth Circuit held the district court did not abuse its discretion by allowing the government to present expert valuation testimony from a United States Customs Special Agent about the value of seized marijuana. Prior to trial, the government provided a Street Level Drug Price List upon which the Customs Special Agent relied in part, and at trial the agent "testified that he had investigated illegal narcotics trafficking for eleven years and had participated in seminars on methods and techniques of drug trafficking organizations. He further testified that he obtained experience in the value of illegal narcotics from intelligence databases, in-house intelligence agents, confidential informants, defendants he had debriefed, and cooperating defendants" *Id.* at 1108, 1112. In contrast, the government has not provided any similar foundation showing a basis for the proposed valuation testimony.

In light of all of the circumstances, including Agent Alfaro's lack of experience with drug trafficking investigations in American Canyon; relatively recent experience with street-level trafficking of heroin, cocaine and methamphetamine in the distinctive location of the Tenderloin; the lack of an articulated methodology – aside from "experience" – for Special Agent Alfaro's proffered opinions; and the fact that this case is not complicated, the Court concludes that the government has not met its burden to show that the testimony is admissible as "expert" testimony. If the government wishes to present some of the proposed testimony – such as the use of baking power as a cutting agent – the government can seek to do so through a percipient witness like Officer Scott.

**IT IS SO ORDERED**.

Dated: September 26, 2026

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California